

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-07-077-CV

IN THE INTEREST OF M.W., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Sonja P. appeals from the trial court order terminating her parental rights to M.W. In one issue, she challenges the factual sufficiency of the evidence to support the trial court's best-interest finding. We affirm.

### Evidence

M.W. was born in 2002 when Sonja was fifteen years old. At the time of trial, M.W. was four and Sonja was nineteen. M.W.'s father, Daniel W., left Sonja when M.W. was four months old.[2]

---

[1]*See* TEX. R. APP. P. 47.4.

[2]Daniel was served with process in the trial court proceedings but did not make an appearance. The trial court terminated Daniel's parental rights, and Daniel has not filed an appeal.

In 2005, when M.W. was almost three, she contracted bacterial meningitis, resulting in the amputation of both legs at the knees, all of the fingers on her left hand, and multiple fingers on her right hand. She began to receive physical therapy at Cook Children's Medical Center in June 2005.

Teresa Brumbaugh, a therapist at Cook Children's, testified that M.W.'s therapy initially included wound care because M.W. had open wounds and a skin graft. Brumbaugh testified that without adequate wound care, the wounds would take longer to heal and could lead to a life-threatening situation. Brumbaugh intended to work with M.W. two to three times per week, but Sonja took her to only about half of the scheduled appointments. Brumbaugh stressed the importance of attending the appointments to Sonja both by phone and in person. Sonja's explanation for the missed appointments was lack of transportation. When the hospital arranged transportation for her, Sonja cancelled the arranged transportation, saying that she had transportation of her own, but then something would fall through and M.W. would miss the appointment. Brumbaugh testified, "There was always something, but typically it revolved around transportation."

When Sonja did take M.W. to the hospital for therapy, M.W. was often visibly dirty and smelled of urine. Brumbaugh was concerned about infection control because M.W.'s bandages were dirty. She instructed Sonja on how to

2

remove M.W.'s bandages and clean her wounds, but she did not "think that that was probably getting done." After the State removed M.W. from Sonja's home in September 2005 and placed her in foster care, M.W. attended all of her appointments. Brumbaugh testified that M.W. made minimal progress while she lived with Sonja and made better progress after the State placed her in foster care.

Brumbaugh testified that when Sonja attended M.W.'s appointments, she appeared to be nurturing and bonded with M.W. and was very affectionate and loving towards M.W. during wound care sessions, which were very painful.

Carrie Carney, another Cook Children's therapist who worked with M.W. from June 2005 through April 2006, testified that M.W. missed six of thirty-seven scheduled therapy appointments early in her treatment, and another nine appointments were cancelled. Carney said she was concerned that the missed appointments would delay M.W.'s wound healing, which would in turn delay the start of range of motion therapy and prosthetics fitting. Like Brumbaugh, Carney testified that when Sonja did bring M.W. to appointments, M.W. was dirty and smelled of urine, which made Carney worry about M.W.'s wounds becoming infected. Carney said that M.W. made better progress after she was placed in foster care.

Stacie Hall is an investigator for the Department of Family and Protective Services ("the Department"). She testified that she received a referral regarding M.W. in June 2005 because M.W. had missed several therapy appointments. Hall explained to Sonja that Medicare-funded transportation was available to her and told her that lack of transportation was no longer an excuse for missing therapy appointments. But Sonja continued to miss appointments anyway, and Hall received another referral regarding M.W. in September 2005. When Hall visited Sonja's home as part of her investigation, she found that M.W. and her one-year-old sister, M.M., were healthy and clean and that M.W. had on clean bandages. Hall nevertheless made a finding of "reason to believe for medical neglect," and removed M.W. from Sonja's home. M.M. was not removed.

Christine Petrone, a Department caseworker, testified that she received M.W.'s case in October 2005 and developed a service plan for Sonja. Sonja submitted to a psychological assessment but failed to attend counseling sessions, again citing lack of transportation as the cause. Petrone told Sonja that she needed to attend M.W.'s medical appointments as part of her service plan, but Sonja continued to miss the majority of appointments.

Apart from a short stint as an employee at a retail store, Sonja was unemployed. Petrone testified that Sonja did not have stable housing; at times she lived in an apartment, and at other times she lived with friends. When

4

Petrone transferred the case to another caseworker in April 2006, Sonja was living in an apartment paid for by her boyfriend, John M. The Department's permanency plan was still reunification at that time, though Petrone had concerns about Sonja's ability to maintain stable employment and housing and her willingness to take M.W. to her therapy appointments.

The Department placed M.W. with John M.'s stepmother, Tonie S., for nine months. Tonie testified that she took M.W. to all of her appointments but that Sonja attended only half of the appointments. Sonja went to Tonie's house to visit M.W. on weekends, and she called M.W. every night. Tonie thought Sonja was making good progress in the service classes. Eventually, Tonie returned M.W. to Department care because her husband developed health problems and he and Tonie did not like the way the Department treated them.

Janice Barker works for the "protective homemakers department" of Volunteers of America. She began working with Sonja on her homemaking skills in August 2006. Barker testified that Sonja's home "started off clean, then we went through a period where it was not clean, and then after her baby was born, it seemed to get back on track." The "period where [the home] was not clean" was when several people moved in with Sonja, which made Barker concerned because "it was very crowded. It seemed to get out of control." Barker observed Sonja visit with M.W. at a Department office, and she testified

5

that the visit went very well, Sonja was nurturing and loving with M.W., and Sonja and M.W. were bonded.

Emma Lopez, a "social service tech" with the Department, assisted Department caseworkers with parent-child visitations. She observed visitations between Sonja and M.W. beginning in March 2006. Sonja brought her other two children to the visitations. One came to the visitations twice without shoes, and other times her clothes were dirty. The other child appeared clean, but his blanket had a bad smell, and Sonja propped his baby bottle up to allow him to feed himself, even after Lopez advised Sonja that doing so could lead to infections. Sonja had a difficult time paying attention to all three children during the visitations. But Lopez also testified that M.W. required close watching to make sure she didn't injure herself, and she was never injured during one of the visitations.

Sandy Balderas, another Department caseworker, testified that, in December 2006, she investigated a report that Sonja's other two children were physically neglected. When Balderas visited Sonja's home, she saw a marijuana cigarette in an ashtray, and the smell of marijuana was very evident as soon as she entered the home. Sonja admitted that she had smoked marijuana about two hours before Balderas's arrival and said she smoked marijuana twice a day. Sonja's middle child was naked; Sonja said she was toilet training her. The

6

kitchen was "crawling with roaches." Balderas opened the door to the apartment's balcony, but could not walk onto the balcony because it was full of trash and pizza boxes. Balderas saw fist-sized holes in the walls throughout the apartment; Sonja told her they resulted from furniture being moved around. The mattress in the bedroom was on the floor and had no linens on it. Balderas found several dirty diapers on the bathroom floor. Based on these findings, Balderas removed the children from Sonja's home and placed them with Tonie S.

Judy Olson is a child advocate who visited M.W. several times while she lived with Tonie S. and again while M.W. lived with the foster parents with whom she lived at the time of trial. Olson described M.W. as "very happy, very settled . . . and pleasant." M.W. was doing very well in school and making progress with the use of her prosthetics. M.W. was scheduled for surgery to have part of one leg bone removed soon after trial to make one of her prosthetics fit more comfortably. Her foster parents at the time of trial were not interested in adopting her.

Olson also visited Sonja at Sonja's apartment. The apartment was fairly tidy, but the carpet was very dirty. Olson said she had talked to Sonja about how difficult it would be for her to care for three small children, especially when one needed to attend numerous medical appointments and another one was a

baby. Olson was concerned that Sonja would tell her what Olson wanted to hear and not tell her the whole story. Sonja told Olson that she had a job at a retail store but could not show her a pay stub, and the manager of the store had no record of Sonja ever working there.

Olson recommended that Sonja's rights be terminated and said that termination was in M.W.'s best interest. She testified that M.W. needed to live with a family who can care for her, provide a clean, safe, loving environment for her, and allow her to continue with her medical therapy and education.

Tomika Hardin was M.W.'s caseworker at the time of trial. Hardin testified that when she first received the case in December 2006, she visited Sonja's home. Sonja's middle child was naked, the home was a mess, and the baby was on the floor on a mattress with a bottle propped in his mouth. She found trash all over the floors, roaches crawling around, holes in the walls, and trash on the patio. Hardin was concerned about returning M.W. to that environment because M.W needed a clean and sterile home environment. At the time of trial, Sonja was living with her sister and her sister's husband—who had a criminal history—in Mineral Wells. She told Hardin she planned to move to Mesa, but she had not told Hardin what the living arrangements would be there.

Hardin had read about Sonja's marijuana use, but she saw no evidence of marijuana in the home. Sonja had attended twenty-seven of twenty-eight drug counseling sessions, with the twenty-eighth scheduled for the week of trial, but her last few drug tests were positive for marijuana.

Hardin testified that her major concern with Sonja was lack of stability because she did not have a job and her boyfriend was paying her bills. She said termination was in M.W.'s best interest because she needs a stable, loving environment with some sense of security. Hardin testified that M.W. was adoptable and very loving, very affectionate, and very friendly. She also said that M.W. had a loving relationship with Sonja.

Sonja testified that she had moved several times while the case was pending, but denied that she ever lived with friends. She said her boyfriend—the father of her other two children—gave her money for rent, food, diapers, baby formula, clothing, and household supplies. She testified that she and her boyfriend had rented a trailer home and expected to move in shortly after trial. She acknowledged that her boyfriend had not participated in any of the services in the service plan and that he had refused to take a drug test for the Department.

Sonja explained that she missed many of M.W.'s therapy appointments because she did not have stable transportation; her truck was always breaking

9

down, and the Medicaid transport arranged by Cook Children's was always late.

Sonja testified that she completed all of the parenting classes that were part of her service plan and took three additional classes on her own initiative. She said that her final drug counseling session was scheduled for the day after trial and that she had been clean since December 9, 2006.

Sonja said she was looking for work and had submitted an application for a job cleaning houses, which she expected to pay $125 per week. She had been admitted to Everest College and intended to earn her high school degree.

### Discussion

#### A. Preservation

Before turning to Sonja's factual sufficiency issue, we must address the State's argument that Sonja failed to preserve her issue for our review because she failed to request a hearing in the trial court on her statement of points filed under family code section 263.405(b). *See* TEX. FAMILY CODE ANN. § 263.405(b) (Vernon Supp. 2007). Relying on the Dallas court of appeals's opinion in *In re R.J.S.,* the State contends that a parent appealing a termination in a case brought by the Department must "present" a section 263.405(b) statement of points by both timely filing the statement and requesting a hearing. 219 S.W.3d 623, 626 (Tex. App.—Dallas 2007, pet. denied).

This court recently rejected the identical argument and declined to follow our sister court's precedent. *In re J.A.B.*, No. 02-06-00404-CV, 2007 WL 3037720, at *2 (Tex. App.—Fort Worth Oct. 18, 2007, no pet. h.). For the same reasons articulated in our opinion in that case, we reject the State's preservation argument. *See id.*

**B.    Factual sufficiency of best-interest finding**

In her sole issue, Sonja argues that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in M.W.'s best interest.

When reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the termination of the parent's parental rights would be in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

11

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1)   the desires of the child;

(2)   the emotional and physical needs of the child now and in the future;

(3)   the emotional and physical danger to the child now and in the future;

(4)   the parental abilities of the individuals seeking custody;

(5)   the programs available to assist these individuals to promote the best interest of the child;

(6)   the plans for the child by these individuals or by the agency seeking custody;

(7)   the stability of the home or proposed placement;

(8)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)   any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

We will consider the *Holley* factors applicable to this case.

**1. Present and future physical needs and physical dangers**

Of all the *Holley* factors, M.W.'s current and future physical needs are paramount. The evidence showed that, because of her physical disability, M.W. will need extraordinary medical and therapeutic care now and in the future. The record shows that Sonja was unable to provide reliable transportation for M.W. during the critical wound-care phase of M.W.'s therapy, even when free transportation was arranged for her. Moreover, the record shows that Sonja was unable to keep her home clean when M.W. needed a clean environment to minimize the risk of infection. While the immediate and serious risk of wound infection had apparently abated by the time of trial because M.W.'s wounds had healed, she was scheduled to undergo surgery to remove part of a bone in her leg shortly after trial, and Carney testified that

13

M.W.'s prosthetics could cause new wounds, either of which would renew the risk of infection. These factors weigh heavily in favor of termination.

### 2. Present and future emotional needs

The record shows that M.W. is bonded to Sonja and has an appropriate and loving relationship with her. This weighs against termination. The record also shows that M.W. is very happy with her foster parents, is very outgoing, easily adapts to new people in her life, and is adoptable. Thus, while M.W. is bonded to Sonja, an adoptive family should be able to meet her emotional needs in the future.

### 3. Sonja's parental abilities

The record shows that Sonja's parental abilities are less than optimal. She was unable to provide a clean, stable home for any of her children. She admitted to smoking marijuana while caring for her two younger children. Sonja had difficulty managing all three children during visitations with M.W. Even after warnings about allowing her youngest child to feed from a propped-up bottle, Sonja continued that practice.

### 4. Programs available to assist Sonja to promote M.W.'s best interest

Sonja completed the parenting classes required by her service plan, plus another three she completed on her own initiative. But the record also shows that she failed or refused to use the transportation program available to help her

14

take M.W. to her therapy appointments. Thus, the evidence shows that programs are available to assist Sonja, but she is not always willing to use them for M.W.'s benefit.

**5. Any excuse for Sonja's acts and omissions**

Sonja's relatively young age was one excuse for her acts and omissions, but not one that weighs against termination. She made excuses for her behavior, but various witnesses expressed frustration with her explanations. Brumbaugh said, "There was always something" to prevent Sonja from taking M.W. to therapy. Petrone said, "[I]t was one excuse after another." Hardin said Sonja was a lot of talk and no action.

**6. Other considerations**

Sonja argues that the trial court was forced to make a premature termination decision by family code section 263.401's eighteen-month deadline to commence trial or dismiss a termination suit. *See* TEX. FAM. CODE ANN. § 263.401 (Vernon Supp. 2007). She also suggests that the trial court should have denied the Department's petition for termination and ordered M.W. to remain in foster care until Sonja could prove that she was drug free, find employment, establish a stable home, and show that she was capable and willing to act in the best interest of a child with M.W.'s exceptional needs. But as the State responds, Sonja already had eighteen months from the time the

15

Department filed suit to accomplish these tasks, and she had accomplished none of them. Sonja does not explain how further delay and perhaps another trial are consistent with the presumption that prompt and permanent placement is in M.W.'s best interest. *See id.* § 263.307(a).

## Conclusion

This is not a simple case. The evidence does not weigh entirely in favor of termination. All witnesses agreed the M.W. was bonded to Sonja and that they had a loving relationship, but the evidence also shows that Sonja is unable to meet M.W.'s physical needs. Mindful that we must give due deference to the fact-finder's findings and not supplant them with our own, and considering the entire record in this case, we hold that a reasonable fact-finder could form a firm belief or conviction that termination is in M.W.'s best interest. *See In re C.H.*, 89 S.W.3d at 28. We therefore overrule Sonja's sole issue and affirm the trial court's termination order.

PER CURIAM

PANEL F:   GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  March 6, 2008

16